IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KRISTEN YOUNG-FITCH, | ) | Civil No.: 1:12-cv-00740-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Mark A. Manning
Harder, Wells, Baron & Manning, P.C.
474 Willamette
Suite 200
Eugene, OR 97401

      Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION - 1

S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

Willy M. Le
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

      Plaintiff Kristen Young-Fitch brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security (the Commissioner)

denying her applications for Disability Income Benefits (DIB) and Supplemental Security

Income (SSI) benefits under the Social Security Act (the Act).  Plaintiff seeks an Order

remanding the action to the Social Security Administration (the Agency) for an award of

benefits.

      For the reasons set out below, the Commissioner's decision should be affirmed.


**Procedural Background**

      Plaintiff filed applications for DIB and SSI on October 5, 2008, alleging that she had

been disabled since January 31, 1998.[1]

---

[1]There is some confusion as to the alleged date of onset.  In her initial disability report, Plaintiff
alleged that she had been unable to work because of her impairments since April 1, 1988.  However, on
her initial application, she alleged an onset date of January 31, 1998, and this is the date that Plaintiff now
cites as the date of her onset of disability.  Because this is the date that Plaintiff now asserts is correct, I
will consider it as the alleged date of onset of disability rather than April 1, 1988, the date cited by the
Administrative Law Judge in his decision.

FINDINGS AND RECOMMENDATION - 2

After her claims had been denied initially and on reconsideration, Plaintiff timely requested an administrative hearing.

On September 30, 2010, a hearing was held before Administrative Law Judge (ALJ) Michael Gilbert.   Plaintiff; Ronald Fitch, Plaintiff's husband; Dr. William Debolt, an impartial medical expert; and Frank Lucas, a Vocational Expert (VE); testified at the hearing.

In a decision filed on April 20, 2011, ALJ Gilbert found that Plaintiff was not disabled within the meaning of the Act.  That decision became the final decision of the Commissioner on February 24, 2012, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff challenges that decision.

**Background**

Plaintiff was born on November 2, 1967, and was 43 years old at the time of the ALJ's decision.  She graduated from high school and briefly attended college.  Plaintiff has past relevant work experience as a care giver, hand packager, fast-food worker, cashier checker, and retail sales clerk.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is

not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four. The Commissioner determines whether the claimant is able to perform relevant work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(e).

Step Five. The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the

FINDINGS AND RECOMMENDATION - 4

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. <u>Tackett</u>, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. <u>Id.</u>

### <u>Medical Record</u>

In May, 2005, Plaintiff was biopsied for diagnosis of a pruritic rash that covered all parts of her body that were exposed to the sun. She was diagnosed with vascular lichenoid dermatitis and advised to avoid exposure to the sun.

During a visit to her treating physician in December, 2006, Plaintiff reported dyspnea, wheezing, nausea, diarrhea, abdominal pain, headache, depression, and anxiety. Plaintiff's doctor diagnosed common migraine, and prescribed Demerol and Phenergan. He also diagnosed asthma and diabetes type II, uncomplicated.

During a visit to her doctor in February, 2007, Plaintiff reported that she suffered severe, chronic migraines. Her doctor noted mild neurological symptoms and diagnosed type II diabetes. Results of a CT scan and MRI of Plaintiff's head were normal. The medical records indicate that Plaintiff sought treatment for migraines at an emergency room at least 16 times during 2007.

During a visit to her doctor in January, 2008, Plaintiff complained of a severe headache and reported photophobia, phonophobia, and smell aversion. She also reported that she had

FINDINGS AND RECOMMENDATION - 5

developed "an aura with shadowing with severe headaches" during the previous four months, and complained of pain in her knees, shoulders, and elbows which had worsened during the previous two months.  Because the results of earlier scans were normal, the doctor concluded that Plaintiff was likely experiencing a normal migraine headache.

Based on a finding that Plaintiff had a positive reaction at 18 of a possible 18 trigger points, Plaintiff's doctor diagnosed fibromyalgia in February, 2008.  He also diagnosed morbid obesity and noted that Plaintiff had symptoms that were consistent with sleep apnea.  Obstructive sleep apnea was diagnosed in April, 2008, after a sleep study had been performed.

Plaintiff continued to experience frequent migraine headaches throughout 2008, and sought emergency treatment for these at a doctor's office or emergency room at least 9 times that year.  Results of an MRI of Plaintiff's brain taken in July, 2008 were normal.

During a visit to her doctor on March 2, 2009, Plaintiff reported that she had fainted two weeks earlier.  Her doctor diagnosed syncope, and opined that it was most likely a vasovagal response which could be related to Plaintiff's diabetes.  A few days later, Plaintiff reported left lumbar pain that radiated down the hip and around her abdomen.  Paraspinous spasm of the lumbar spine and trochanteric bursa were noted, and Plaintiff's doctor diagnosed trochanteric bursitis.

A lumbar x-ray taken on March 6, 2009 to address Plaintiff's complaints of abdominal pain showed mild multilevel spondylosis.

On May 9, 2009, Plaintiff reported that her skin blistered when exposed to sunlight or bright lights.  Acute dermatitis from solar radiation was diagnosed.  Plaintiff also requested referral for bariatric treatment.

FINDINGS AND RECOMMENDATION - 6

On October 21, 2009, Plaintiff was admitted to a hospital after reporting that she had awakened in an "altered mental status." The admitting doctor noted that Plaintiff was significantly agitated, and had a history of anxiety disorder. She was kept overnight and discharged the next day after her condition had improved.

On November 5, 2009, Dr. Walter Carlini, a neurologist, and Pamela Miller, a nurse practitioner, examined Plaintiff to address complaints of neck pain and increasingly frequent migraine headaches. Plaintiff reported that she experienced nausea, vomiting, photophoia, phonophobia, and kinesophobia with her headaches, as well as intense head pain and blurry vision. She said that her headaches occurred two or three times a week, and lasted from one to two days. Plaintiff said that Imitrex was helpful if she was able to detect the onset of a migraine early, but had been ineffective recently because many of her headaches started while she was sleeping, and she was not able to take the medication in time to reduce the severity of her symptoms. She complained of significant neck pain and wondered whether this could be causing her migraines. In addition, she reported tingling numbness in her left arm and in all of her fingers. Plaintiff reported that an MRI taken four months earlier had been "unremarkable."

Dr. Carlini noted that an MRI of Plaintiff's cervical spine taken in June, 2009 had shown that Plaintiff's spinal cord was mildly indented by a herniated disc at C5-6. He diagnosed episodic migraines, intractable; diabetes mellitus; hypertension; hypercholesterolemia; asthma; PMLE; and fibromyalgia. Dr. Carlini told Plaintiff that migraines were often associated with neck pain, and that the MRI findings did not correlate to the numbness and tingling that she described.

A day after this examination, Plaintiff sought emergency treatment for shakiness in her legs and tingling in her arms and legs. No clear source of these symptoms was determined, and

FINDINGS AND RECOMMENDATION - 7

she was discharged the following day after the symptoms had resolved.  The discharge diagnosis indicated that the symptoms could be "related to anxiety or psychogenic," and indicated that a herniated cervical disk was a possible differential diagnosis.

On November 13, 2009, Plaintiff was again hospitalized after complaining that her legs were "feeling wobbly" and that her legs and hands were numb and tingling.  Dr. Richard Karchner, a hematological oncologist, examined Plaintiff a few days later.  He suspected a myeloproliferative process but was not certain that it was causing Plaintiff's symptoms.

During a visit to Dr. Roma Sprung on November 16, 2009, Plaintiff reported that she had experienced leg tremors and convulsions, and episodes during which her legs would "give out on her."  Dr. Sprung noted that during the previous few weeks Plaintiff had gone to an emergency room and that she had been hospitalized several times based upon complaints of weakness in her legs, leg spasms, and the inability to stand without assistance.  She noted that an MRI of Plaintiff's head and neck was negative and that a spinal tap was "benign."  Dr. Sprung concluded that Plaintiff's request for a wheelchair was "reasonable until her disease process [was] elucidated."

During a visit to Dr. Zakir Ali, a neurologist, on November 18, 2009, Plaintiff was able to rise from her wheelchair and walk a few steps.  Dr. Zakir noted that Plaintiff had functional giveway weakness, and opined that Plaintiff's diffuse symptoms made it difficult to know if Plaintiff had a neurological disorder or if the symptoms were functional.  He recommended an MRI and an EEG.

An MRI taken on November 23, 2009, showed patchy foci of T2 prolongation, which was interpreted as indicating the possibility of a post traumatic inflammatory infection, a mass, or lesions with surrounding edema.  Results of a recommended follow-up cerebral angiogram

FINDINGS AND RECOMMENDATION - 8

were normal.

An MRI of Plaintiff's thoracic spine performed on December 1, 2009, showed a broad-based disc bulge at T7-8, flattening of a portion of the thecal sac and mildly narrowing the central spinal canal, a small protrusion approaching the thecal sac at T8-9, and a small disk protrusion at T9-10 with minimal mass effect on the thecal sac.

An MRI of Plaintiff's cervical spine performed the same day showed degenerative disc disease, which was most pronounced at the C5-6 level, with moderate sized paracentral and foraminal protrusion causing mass effect on the thecal sac and narrowing of the spinal canal. Moderate right neural foraminal narrowing was also noted.

An MRI of Plaintiff's lumbar spine taken on December 2, 2009, showed mild bilateral neural foraminal narrowing at L3-4, disc desiccation and disc space narrowing with a small disc protrustion at L5-S1 with minimal canal stenosis, moderate facet hypertrohic changes with marked neural foraminal narrowing, and questionable contact with the exiting left L5 root nerve. The radiologist thought that potential contact with the exiting left L5 nerve root might contribute to a lumbar left L5 radiculopathy.

Following her continued complaints of recurrent muscular contractions with weakness, Plaintiff was referred to Dr. Paul Jorizzo, who diagnosed papillodemia associated with increased intracranial pressure. Plaintiff was hospitalized with a diagnosis of psuedotumor cerebri, a condition commonly associated with obesity in young women. See Steadman's Medical Dictionary, 7th ed., p. 1390.

Surgery was performed on December 28, 2009, to place a shunt to relieve intracranial pressure. During a follow-up visit on January 5, 2010, Plaintiff reported that her headaches, weakness, syncope, and tremors were all improving following surgery. She said that her

headaches had nearly disappeared, and that her need for insulin had dropped significantly.  On January 30, 2010, Plaintiff reported increasing pain in her head.  Her treating physicians consulted and agreed that Plaintiff had an "underlying migrainous headache background" that was separate from her intracranial hypertension symptoms.

In his record of a visit on January 12, 2010, Dr. Ali, a neurologist, stated that Plaintiff's headaches had improved significantly following surgery, and that she had returned to her "baseline migraine headache."  He added that a "repeat spinal fluid pressure evaluation" would need to be performed if Plaintiff again experienced her "well recognized" non migraine headaches.  Plaintiff complained of episodes of agitation and confusion.  Later the same day, Plaintiff sought emergency treatment for a headache.  She reported that she had experienced an "emotional day," and said that she had a migraine every time she cried.  Plaintiff's shunt appeared to be functioning correctly.  She was diagnosed with recurrent headache and discharged.

On February 7, 2010, Plaintiff went to an emergency room with complaints of severe, intractable pain in her right lower abdomen.  The likelihood of appendicitis was considered low, but an appendectomy was performed at Plaintiff's insistence because the reported pain could not be controlled.   Plaintiff reported improvement immediately following surgery.  However, the removal of her appendix did not resolve her abdominal symptoms as she reported abdominal pain, depression, and anxiety during a visit to her treating doctor a few days later.  Plaintiff's doctor noted that Plaintiff's diabetes was uncontrolled.

On March 5, 2010, Plaintiff went to an emergency room with complaints of severe abdominal pain.  She was diagnosed with hypoglycemia, and her diabetes was described as "notoriously poorly controlled."  An examining physician noted that Plaintiff was "exquisitely

FINDINGS AND RECOMMENDATION - 10

tender with minimal palpation over the lower quadrant" and that Plaintiff had "minimal tenderness" when she was distracted.

Plaintiff continued to seek emergency treatment for complaints of pain and/or migraines many times through the remainder of 2010.  In a visit to an eye care center on April 13, 2010, Plaintiff reported that she was experiencing more migraines.  Dr. Jorizzo noted papilledema with increased intracranial pressure, which had improved significantly since the shunt had been implanted.  He noted that Plaintiff had experienced a minimal loss of vision, which might be temporary.

On April 16, 2010, Plaintiff sought treatment for a migraine at an emergency room.  The treating physician noted that this was Plaintiff's 15th visit to the emergency room since January 12, 2010, and that half of the visits had been based upon migraines, and half based on abdominal pain.  The doctor told Plaintiff that he would not prescribe narcotic pain medication, and treated her with Inapsine, Toradol, Reglan, and Benadryl.

During a follow-up visit on April 19, 2010 to Dr. Bobek, the doctor who had implanted her shunt, Plaintiff reported that she continued to do well for the most part, but continued to have episodic migraines.  During a visit the same day with Dr. Sprung, her treating physician, Plaintiff reported an increased problem with gait instability.

During a visit to Dr. Sprung on May 19, 2010, Plaintiff reported that she was again experiencing tremors.  She also complained of sweats, fatigue, malaise, headache, weakness, paresthesias, vertigo, depression,  and anxiety.

During a visit to Dr. Sprung on June 23, 2010, Plaintiff reported that she was "really feeling well," had "had a good month," and had not had any headaches since starting a slow release morphine regimen.  Plaintiff complained of nausea and weight loss; she had lost 20

pounds and worried that she would not qualify for bariatric surgery, which she thought would cure her diabetes.. Dr. Sprung administered a trigger point injection to relieve pain attributed to fibromyalgia.

During a visit to Dr. Sprung on August 16, 2010, Plaintiff reported that she had blurry vision in her left eye, and was worried that her intracranial pressure might again be building. Dr. Jorizzo examined Plaintiff on August 19, 2010, and found that her optic nerves appeared normal. He referred her to Dr. Bobek, who had implanted her shunt. Dr. Bobek tested the shunt during a visit on August 20, 2010, and found that it was working properly.

At the request of Plaintiff's counsel, Dr. Sprung completed a medical evaluation form. In a form dated September 8, 2010, Dr. Sprung listed Plaintiff's diagnoses as including pseudotumor cerebri, ataxia, and peripheral neuropathy, "among others." She reported that Plaintiff's symptoms included ataxia, pain, headaches, fatigue, and inability to walk without assistance. Dr. Sprung stated that Plaintiff experienced drowsiness, nausea, and balance problems as side effects of her medications, and opined that Plaintiff needed to lie down to rest 4 to 5 hours during the day because of ataxia and problems with balance. She opined that Plaintiff could stand and walk less than 20 minutes during an 8 hour work day, could never lift as much as 10 pounds, and could not work a full day.

At the request of the Agency, Dr. Michael O'Connell, a psychologist, examined Plaintiff after the hearing before the ALJ. In her meeting with Dr. O'Connell on December 14, 2010, Plaintiff reported that she had been sexually abused when she was 6 or 7 years old, and had later been assaulted repeatedly by a boyfriend. She said she had never held a full time job, could not remember how much part time work she had done, and had been fired from her last job four years earlier because of attendance problems. Plaintiff reported that she had a past history of

methamphetamine abuse, which she had used regularly for 20 years, and that she smoked medical marijuana twice a day.  She said that she walked occasionally, and that she used a wheelchair because she was afraid of falling.  Plaintiff said that she was anxious 10% of the time, and experienced panic attacks, the most recent of which had occurred during the previous week.

Dr. O'Connell described Plaintiff's affect as depressed, her speech as slow and halting, and her pain behavior as "copious."  On testing, Plaintiff's short term memory appeared to be limited.  Personality testing indicated a tendency to overstate problems, but produced a valid profile.  Test results indicated that Plaintiff's complaints were "likely to be exaggerated with respect to underlying organic pathology," and were consistent with a somatoform disorder, but that this diagnosis would require evaluation of Plaintiff's medical condition.

Results of IQ testing were in the average range of intellectual functioning, and Plaintiff's ability to sustain attention, concentrate, and exert mental control was in the low average range.  Plaintiff's processing speed was in the extremely slow range.

Dr. O'Connell diagnosed Pain Disorder associated with psychological factors and a general medical condition; Anxiety Disorder, NOS; Cannabis Dependence (provisional); Opioid Dependence (provisional); Somatoform Disorder NOS( provisional); and deferred diagnosis on Axis II, with some histrionic features.  He rated Plaintiff's Global Assessment of Function as 55.

Dr. O'Connell stated that Plaintiff appeared to be capable of understanding and remembering basic instructions that might be presented in a work setting, and opined that her complaints of pain and pain behavior might affect her ability to function in a workplace.  He opined that task persistence would likely be an issue because of Plaintiff's complaints of pain "or

other somatic difficulties," and that Plaintiff's pain behavior would likely have a significant impact on her ability to interact appropriately with coworkers and supervisors.

## Testimony

### Plaintiff

Plaintiff testified as follows at the hearing.

Plaintiff experiences headaches approximately twice per week, and treats the pain with morphine sulfate, marijuana taken orally, Imitrex, and Naproxen. Her doctor has also prescribed six Dilaudid pills per month which Plaintiff uses in case of breakthrough pain. A treating physician had prescribed the wheelchair that Plaintiff was using on the day of the hearing because of Plaintiff's severe tremors and shakes: A shunt had been implanted in Plaintiff's head and Plaintiff's doctors were concerned that she risked injury if she fell. Plaintiff experienced shakes and tremors less frequently since the shunt was implanted, but they continued to cause Plaintiff problems. Plaintiff was able to walk in her house, where hand holds had been installed. She used a wheelchair on visits to town.

Migraines and a "solar allergy" posed the greatest obstacles to Plaintiff's employment. A few hours of exposure to the kind of lights installed in the room where the hearing was held or exposure to sunlight caused Plaintiff to break out in painful, itchy blisters. The polka-dot appearance of the resulting rash made it difficult for Plaintiff to work in the food service industry because customers did not want to be around her.

Fibromyalgia caused extreme pain in Plaintiff's muscles and joints, and interfered with Plaintiff's ability to work. Short-term memory loss also interfered with Plaintiff's ability to work because it made it difficult for Plaintiff to follow instructions. Plaintiff's medical

FINDINGS AND RECOMMENDATION - 14

problems make it difficult for her attend work reliably.  She cannot  determine the date of the onset of her disability with confidence.

Plaintiff was 5' 1" and weighed approximately 198 pounds at the time of the hearing.  She is diabetic, needs to check her blood sugar 3 or 4 times a day, and takes both fast-acting and-slow acting insulin.  She also takes medication to control her blood pressure, and was participating in a weight loss program through a hospital at the time of the hearing.  Plaintiff hoped to have bariatric surgery scheduled during the month following the hearing.

Plaintiff experienced numbness and tingling in her neck which caused her arms to feel as if they were "going dead."  She had used a CPAP machine for about a month before the hearing, and continued to experience difficulty sleeping even when she was using that device.  She had stopped smoking cigarettes 3 or 4 years earlier, and did not drink alcohol.

2. **Ronald Fitch**

Ronald Fitch, Plaintiff's husband, testified as follows at the hearing.

Plaintiff experiences 2 or 3 headaches that "verge on migraines" per week.  She has "full blown" migraines 3 or 4 times a month that require her to be taken to an emergency room or to see a doctor.  When she has severe migraines, Plaintiff has nausea and vomiting, and is sensitive to light, sound, and smells.

Since the previous September or October, Mr. Fitch had noticed that Plaintiff had problems with balance, frequent shaking, and uncontrollable muscle jerks.  These symptoms had diminished somewhat after a shunt was implanted, but seemed to be worsening again.

3. **Dr. DeBolt**

At the request of the Agency, Dr. DeBolt, a board-certified neurologist, reviewed the medical record and testified at the hearing.  Dr. DeBolt testified that there were no objective

FINDINGS AND RECOMMENDATION - 15

findings establishing that Plaintiff had migraine headaches and fibromyalgia, and questioned whether objective findings established that Plaintiff had imbalance or poor muscle control. He stated that he could "only assume" that Plaintiff's use a wheelchair was based on her subjective impairment rather than on objective reasons. Dr. DeBolt opined that, from an "objective standpoint," Plaintiff had been adequately and appropriately treated with the shunt, and had improved steadily since it was implanted. He opined that Plaintiff's impairments did not meet the requirements of any "listing."

Dr. DeBolt asserted that Plaintiff's muscular strength was not impaired because her neurological examinations had been normal "at least 25 times." He opined that Plaintiff's limitations on walking and standing were self imposed, and agreed that she should not be exposed to dust, smoke, environmental toxins, and the sun.

Dr. DeBolt disagreed with Dr. Sprung's assessment of Plaintiff's functional limitations, and agreed that a mental status examination would be helpful.

On examination by Plaintiff's counsel, Dr. DeBolt testified that small white spots are often described on MRI's of patients with migraines, but that these are not "clearly diagnostic of migraine." He testified that studies had indicated that marijuana might be helpful for some individuals who had migraines. He also testified that ataxia is a symptom related to psuedotumor cerebri, but that neither of the two neurological specialists who had seen Plaintiff had commented on ataxia.

4. **Vocational Expert**

The ALJ posed a vocational hypothetical describing an individual of Plaintiff's age, education, and experience, who could perform a full range of medium exertional level work except for the need to have only occasional exposure to excessive noise and vibration, irritants,

FINDINGS AND RECOMMENDATION - 16

fumes, odors, dust, gases, and poorly ventilated areas. The VE testified that such an individual could perform Plaintiff's past work as a care giver, retail sales clerk, cashier checker, fast food worker, or hand packager.

When the ALJ imposed the same limitations but specified only light duty work, the VE testified that Plaintiff's past work as a care giver and hand packager would be eliminated, but that work as a bar attendant or marking clerk would be possible.

The ALJ then modified the hypothetical to allow no more than 2 hours per day standing and walking, and sitting for up to 6 hours, with normal breaks. The VE responded that this would limit the individual to sedentary work, and would permit work as a bench hand, hand suture winder, or proofreader. He testified that an individual who could not work 8 hours per day, 40 hours per week because of frequent severe headaches, or who missed work more than 2 days per month because of headaches, could not maintain competitive employment.

In response to questioning by Plaintiff's counsel, the VE testified that an individual working as a retail sales clerk, hand packager, marking clerk, or bench hand would be exposed to fluorescent lighting, that a bar attendant may or may not be exposed to fluorescent lighting, and that a care giver would not be exposed to fluorescent lighting.

## ALJ's Decision

The ALJ found that Plaintiff had met the requirements for insured status through June 30, 1999.

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability.

At the second step, the ALJ found that Plaintiff had the following severe impairments: asthma, migraine headaches, diabetes mellitus, fibromyalgia, vascular lichenoid dermatitis, morbid obesity, psuedotumor cerebri, and sleep apnea.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  He found that Plaintiff retained the capacity to perform light exertional level work, subject to the following restrictions: She could not perform work that required more than occasional exposure to excessive noise and vibration, and needed to avoid concentrated exposure to respiratory irritants such as dust, fumes, or odors.  The ALJ further  found that Plaintiff's  statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with this RFC assessment.

Based upon the testimony of the VE, at the fourth step, the ALJ found that Plaintiff could not perform any of her past relevant work.

At the fifth step of his disability analysis, the ALJ found that Plaintiff retained the functional capacity required to perform jobs that existed in substantial numbers in the national economy.  As examples of such work, he cited bar attendant, marking clerk, bench hand, suture winder, and type copy examiner positions.  Based upon this conclusion, he found that Plaintiff was not disabled within the meaning of the Act.

FINDINGS AND RECOMMENDATION - 18

**Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Claimants bear the initial burden of establishing disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record,  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process.  Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

**Discussion**

Plaintiff contends that the ALJ erred in failing to fully credit the opinion of Dr. O'Connell, erred in failing to include a pain disorder and anxiety disorder in the list of Plaintiff's severe impairments at step two of the sequential disability analysis, failed to give legally

FINDINGS AND RECOMMENDATION - 19

sufficient reasons for rejecting the opinion of Dr. Sprung, erred in finding that she was not

wholly credible, erred in failing to fully develop the record, and failed to meet the burden of

establishing that she could perform "other work" that existed in the national economy.

## I. **ALJ's Assessment of Dr. O'Connell's Opinions, Step Two Analysis, and Development of the Record**

As noted above Dr. O'Connell stated that Plaintiff appeared to be capable of

understanding and remembering basic instructions that might be presented in a work setting, and

that her complaints of pain and pain behavior might affect her ability to function in a workplace.

He opined that task persistence would likely be an issue because of Plaintiff's complaints of

pain "or other somatic difficulties," and that Plaintiff's pain behavior would likely have a

significant impact on her ability to interact appropriately with coworkers and supervisors.

Plaintiff contends that the ALJ erred in rejecting Dr. O'Connell's opinions concerning

her impairments and in failing to account for limitations Dr. O'Connell had identified in his

analysis at step 2 of the disability evaluation and in his assessment of her RFC. She also

contends that the ALJ erred in concluding that Dr. O'Connell had rated her GAF at 55 based

upon "analysis of situational stressors," and the effects of various drugs she was taking, and in

concluding that this GAF was based on Plaintiff's own reports concerning her impairments and

was inconsistent with objective findings.

A careful review of the ALJ's decision and the record does not support these arguments.

## A. **ALJ's Evaluation of Severity of Impairments at Step 2**

An impairment or combination of impairments is considered "severe" at step two if it

significantly limits a claimant's ability to perform basic work activities. SSR 96-3p. An

impairment is not severe only if it is a slight abnormality that has no more than a minimal effect

on the ability to do such activities.  Id.  The "severe impairment" analysis is a "*de minimis*
screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th
Cir. 1996).

Here, the ALJ cited substantial evidence supporting his conclusion that the "record as a
whole" indicated that Plaintiff's mental impairments were not "severe" within the meaning of the
relevant regulations.  The ALJ noted that, despite her anxiety, restlessness, worry and
rumination, impatience, irritability, and "tendency to overstate her problems when she was using
morphine and marijuana" the objective mental status testing done by Dr. O'Connell was "within
normal limits."

The ALJ's conclusion that Dr. O'Connell based his evaluation of Plaintiff's GAF on her
"own subjective report" is a reasonable interpretation of Dr. O'Connell's report.  In addition, the
ALJ's conclusion that Plaintiff's description of her limitations was not reliable is supported by
the ample reasons he gave supporting his determination that Plaintiff was not wholly credible.
The ALJ cited evidence concerning Plaintiff's activities of daily living; social functioning;
concentration, persistence, or pace; and decompensation that were consistent with his conclusion
that her mental impairments were not "severe" within the meaning of the relevant regulations

B. **Rejection of Some of Dr. O'Connell's Opinions**

An ALJ must provide clear and convincing reasons for rejecting the uncontradicted
opinions of an examining physician, Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990), and
must provide specific and legitimate reasons for rejecting opinions of an examining physician
that are contradicted by another physician.  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir.
1995).

FINDINGS AND RECOMMENDATION - 21

The ALJ agreed with most of Dr. O'Connell's opinions.  To the extent that he rejected a limited portion of Dr. O'Connell's opinions, the ALJ provided clear and convincing reasons supporting his conclusion that Plaintiff's mental impairments would have no more than a mild effect on her ability to carry out work activities.  These reasons included the ALJ's reasonable conclusion that Dr. O'Connell had based his assessment on Plaintiff's own unreliable statements, his well supported conclusion that the results of Plaintiff's objective mental status testing were generally within normal limits, and Plaintiff's activities which were inconsistent with the conclusion that Plaintiff's mental impairments would have more than a minimal effect on her ability to perform work activities.

C. **Development of the Record**

After Dr. O'Connell had submitted his evaluation, the ALJ denied a request by Plaintiff's counsel that he ask Dr. O'Connell  to complete a mental residual functional capacity form.  Plaintiff contends that, in denying this request, the ALJ failed to adequately develop the record.

I disagree.  Certainly, an ALJ has a duty to fully and fairly develop the record, and to ensure that a claimant's interests are considered.  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  However, an ALJ is required to further develop the record only if the existing evidence is ambiguous, or if the record is inadequate to allow for "proper examination of the evidence," Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).  An ALJ has broad discretion in determining whether additional evidence is needed.  See Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001).

Here, substantial evidence in the record, including results of objective testing set out in Dr. O'Connell's evaluation, supports the ALJ's conclusion that the existing evidence was adequate to allow for an accurate evaluation of Plaintiff's mental status and its effect on her

ability to perform work related functions.  Under these circumstances, the ALJ did not err in

concluding that additional evidence was not necessary.

II. **Opinion of Plaintiff's Treating Physician**

As noted above, Dr. Sprung listed Plaintiff's diagnoses as including pseudotumor cerebri,

ataxia, and peripheral neuropathy, "among others," and reported that Plaintiff's symptoms

included ataxia, pain, headaches, fatigue, and inability to walk without assistance.  She stated

that Plaintiff experienced drowsiness, nausea, and balance problems as side effects of her

medications; opined that Plaintiff needed to lie down to rest 4 to 5 hours during the day because

of ataxia and problems with balance; and opined that Plaintiff could stand and walk less than 20

minutes during an 8 hour work day, could never lift as much as 10 pounds, and could not work a

full day.

The ALJ gave Dr. Sprung's opinion little weight, and found that Dr. DeBolt's assessment

was "more consistent with the record as a whole."  Plaintiff contends that the ALJ did not

provide legally sufficient reasons for rejecting Dr. Sprung's opinion as to her functional

limitations, and erred in accepting Dr. DeBolt's testimony that Plaintiff's restrictions were

largely self imposed.

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and

convincing reasons for rejecting a treating physician's uncontroverted opinions,  Lester v. Chater,

81 F.2d 821, 830-31 (9th Cir. 1995), and must provide "specific, legitimate reasons . . . based

upon substantial evidence in the record" for rejecting opinions of a treating physician which are

contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).

The ALJ noted that Dr. Sprung was the "only acceptable medical source on record that endorses the conclusion that the claimant's condition precludes full-time work . . . ."   However, in the absence of any other contrary assessment by a treating or examining physician that directly addressed Plaintiff's ability to work full-time, the ALJ was required to provide clear and convincing reasons for rejecting Dr. Sprung's opinion.

The ALJ provided several reasons for rejecting Dr. Sprung's opinion.  He noted that Dr. Sprung's concern about Plaintiff's drug seeking behavior was evidenced in emergency room records indicating that she had imposed a care plan precluding the administration of narcotic medications.  The ALJ cited medical records indicating that Plaintiff engaged in drug seeking behavior during frequent visits to emergency rooms, was not believed when she reported that she had lost or vomited her narcotic medications on multiple occasions, exhausted her prescribed supply of narcotic medications early, and was diagnosed with opiate dependency at an emergency room.  The ALJ cited Dr. DeBolt's hearing testimony that, though the record showed that Plaintiff had sought "a tremendous amount of medical care," it contained limited objective findings that supported Plaintiff's subjective complaints.   The ALJ noted that the record did not include evidence that Plaintiff's diabetes or high cholesterol resulted in functional limitations or that her muscle strength was diminished, and  that the record established that Plaintiff's psuedomotor cerebrae had responded well to treatment.  The ALJ cited evidence that Plaintiff had been expected to need a wheelchair for only six months, and evidence supporting the conclusion that Plaintiff had "returned to baseline" following surgery in less than the 12 month period required to establish disability.

In addition to this evidence, the ALJ noted that Plaintiff herself had reported that she was "feeling really well" in June, 2010, and denied that she had experienced headaches since taking

morphine.  He noted that Plaintiff denied fatigue during a visit to Dr. Ali in April, 2010, that her tremors were substantially reduced at that time, and that Dr. Sprung had indicated that some of Plaintiff's lack of energy resulted from over medication.

In support of his conclusion that Plaintiff was significantly less impaired than Dr. Sprung had indicated, the ALJ noted Plaintiff's lack of credibility, which is discussed more fully below. He cited Plaintiff's lack of candor with another treating physician, and Dr. O'Connell's observation of "exquisite pain behavior" and conclusion that Plaintiff's subjective complaints were likely exaggerated.  He cited the latter finding as consistent with Dr. DeBolt's conclusion that Plaintiff's professed limitations were likely self imposed.

These are clear and convincing reasons  for rejecting Dr. Sprung's opinion as to Plaintiff's functional capacity, and they are supported by substantial evidence in the medical record.  An ALJ need not accept opinions such as that set out in Dr. Sprung's functional assessment, which are brief, conclusory, and inadequately supported by clinical findings. E.g., Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  In addition, if a claimant's credibility is properly discounted, a doctor's opinion that is based upon a claimant's subjective complaints may be rejected as well.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 1999).  Here, Dr. Sprung did not cite objective medical evidence supporting the severe functional limitations imposed in her evaluation, but instead appeared to base her assessment on Plaintiff's statements concerning her capabilities.  As noted below, the ALJ's conclusion that Plaintiff was not credible was amply supported.

The ALJ's conclusion that Plaintiff's professed limitations were likely self imposed and far less severe than Dr. Sprung had indicated was not inconsistent with the general rule that the opinion of a treating physician is entitled to more weight than that of a non-examining reviewing

FINDINGS AND RECOMMENDATION - 25

doctor, because the ALJ did not simply credit and rely on Dr. DeBolt's opinion and reject Dr.
Sprung's opinion.  Instead, he reviewed the medical record, noting some of the evidence that Dr.
DeBolt had cited and citing other evidence supporting his own conclusions as to Plaintiff's
functional capacity, and reasonably found that Dr. Sprung's assessment of Plaintiff's functional
capacity was inconsistent with the medical record.  His reasons for reaching that conclusion were
clear, convincing, and fully supported by substantial evidence in the record.

III. **ALJ's Credibility Determination**

The ALJ is responsible for determining credibility, resolving conflicts in medical
testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If
a claimant produces medical evidence of an underlying impairment that is reasonably expected
to produce some degree of the symptoms alleged, and there is no affirmative evidence of
malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility
determination.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464
F.3d 968, 972 (9th Cir. 2006).  If substantial evidence supports the ALJ's credibility
determination, that determination must be upheld, even if some of the reasons cited by the ALJ
are not correct.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir.
2008).

The ALJ must examine the entire record and consider several factors, including the
claimant's daily activities, medications taken and their effectiveness, treatment other than
medication, measures other than treatment used to relieve pain or other symptoms, and "any
other factors concerning the individual's functional limitations and restrictions due to pain or
other symptoms."  SSR 96-7.

Some evidence in the record, including evidence that Plaintiff engaged in repeated narcotic-seeking behavior at emergency rooms, arguably supports the conclusion that Plaintiff at times malingered.  However, given that both parties apparently agree that the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff was not wholly credible, I have assumed that this standard applies in evaluating the credibility issue.

In support of his credibility determination, the ALJ first cited evidence of Plaintiff's "poor work history."  He noted that Plaintiff told Dr. O'Connell that she had never held a full-time job, and had been repeatedly discharged from part-time jobs because of poor attendance. The ALJ reasonably assumed that Plaintiff's work record was adversely affected by Plaintiff's history of abusing "street drugs" that lasted "into her 30's."  He also cited Plaintiff's failure to mention her daily use of marijuana when Dr. O'Connell asked about her drug use.

These reasons provide substantial support for the ALJ's credibility determination: A claimant's poor work history and demonstration of "little propensity" to work supports an adverse credibility finding, e.g., Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002), and a claimant's apparent lack of candor is one of the "ordinary techniques of credibility evaluation" upon which an ALJ may rely in evaluating a claimant's credibility.  Chaudhry v. Astrue, 688 F.3d 661, 672 (9th Cir. 2012).  Moreover, a lack of candor about drug use in particular is a legitimate consideration in evaluating credibility.  Thomas, 278 F.3d at 959.

The ALJ's reference to Plaintiff's requests for narcotic pain medication at emergency rooms and assertions that she had vomited or lost her narcotic medications also supported his credibility determination.   As the Commissioner correctly notes, evidence of drug-seeking is a legitimate basis for discounting a claimant's credibility concerning the degree of pain allegedly experienced.  See Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001).

FINDINGS AND RECOMMENDATION - 27

The ALJ provided specific, clear and convincing reasons for concluding that Plaintiff was not wholly credible, and his credibility determination should not be set aside here.

IV. **Determination that Plaintiff Could Perform "Other Work"**

Plaintiff contends that the ALJ did not meet the burden of establishing, at step 5 of the disability analysis that she could perform other jobs that existed in substantial numbers in the national economy because his vocational hypothetical did not accurately set out all of her impairments. She contends that the ALJ failed to include a limitation based upon migraine headaches which would cause her to miss more than the two days per month, failed to include the limitations identified by her treating physician, and failed to preclude jobs that would expose her to fluorescent light, which she could not tolerate.

I disagree. In order to be accurate, an ALJ's vocational hypothetical presented to a VE must set out all of a claimant's impairments and limitations. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The ALJ's depiction of a claimant's limitations must be "accurate, detailed, and supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions set out in the hypothetical are not supported by the record, a VE's conclusion that a claimant can work does not have evidentiary value. Gallant, 753 F.3d at 1456. However, as the Commissioner correctly notes, the record does not establish that Plaintiff can tolerate no exposure to fluorescent lighting. In addition, for the reasons set out above, I conclude that the ALJ did not err in omitting from his vocational hypothetical the other limitations that Plaintiff contends he should have included.

## Conclusion

A Judgment should be entered AFFIRMING the decision of the Commissioner and DISMISSING this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due July 5, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 18th day of June, 2013.


    /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 29